## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CHEVRON U.S.A. INC. | * | |
| 6001 Bollinger Canyon Rd., | | |
| San Ramon, CA 94583, | * | CIVIL ACTION NO.: _____ |
| | * | |
| PLAINTIFF | | |
| | * | |
| v. | | |
| | * | |
| APEX OIL COMPANY, INC. | | |
| 8235 Forsyth Boulevard, Ste. 400 | * | JURY DEMANDED |
| St. Louis, MO 63105 | | |
| | * | |
| AND | | |
| | * | |
| PETROLEUM FUEL & TERMINAL COMPANY | | |
| 8235 Forsyth Boulevard, Ste. 400 | * | |
| St. Louis, MO 63105 | | |
| | * | |
| | * | |
| DEFENDANTS. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*\*\* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiff Chevron U.S.A. Inc. ("Chevron" or "Plaintiff"), by and through its undersigned

attorneys, files this Original Complaint against Defendants Apex Oil Company, Inc. and Petroleum Fuel

& Terminal Company (collectively, "Apex" or "Defendants").

## Introduction

1.      This suit is brought for injunctive and other relief and past and future remediation and

related costs associated with discharges of petroleum hydrocarbons from an underground pipeline

currently owned by Defendants at a location in southeast Baltimore, Maryland, adjacent to Baltimore's

Harbor.  Since September 1, 1994, Defendants have owned and operated a 12-inch diameter pipeline

1

that runs 3.1 miles east from Defendants' terminal at 1622 South Clinton Street to its terminal at 5101 Erdman Avenue (the "Pipeline").  The portion of the Pipeline at issue in this case runs below Holabird Avenue between South Clinton and South Haven Streets, which forms the northern boundary of a property at 1801 South Clinton Street.  A site drawing is attached as Exhibit A.

2.      Apex is responsible for past and future response costs associated with its "plume"[1] of subsurface petroleum in the groundwater beneath the property at 1801 South Clinton Street (the "Plume").  Apex caused the Plume through ongoing releases since Apex purchased the Pipeline in 1994, including most recently from a large crack Apex discovered in its Pipeline in February 2012.

3.      Chevron has incurred and continues to incur substantial costs to contain and remove Defendants' Plume.  Defendants have refused to pay for those costs or even to discuss with Chevron an equitable allocation of costs.

4.      The area of the Plume and related investigation and response activity is referred to here as the "Site."  The Site includes several structures relevant to the movement of the Plume including, a stormwater detention structure, a concrete stormwater channel (the "Channel"), and additional stormwater drains and infrastructure, some of which are subsurface.  The Channel, often referred to as the "drainage swale" or the "swale," connects to an outfall pipe, which empties into the Harbor.  The other stormwater infrastructure also drains to and connects with the same outfall pipe that empties into the Harbor.

5.      The Harbor is a navigable water of the United States.

6.      On July 1, 1985, Chevron U.S.A. Inc. was merged into Gulf Oil Corporation, a corporation organized under the laws of the Commonwealth of Pennsylvania on August 9, 1922.

---

[1] "Plume" refers to subsurface petroleum hydrocarbons in a liquid form, which can also be mobile.

7.      On July 1, 1985, Gulf Oil Corporation changed its name to Chevron U.S.A. Inc.

8.      As a result of the merger, Chevron took responsibility for Gulf's 1979 diesel release from the Pipeline, and entered into the Maryland Department of the Environment's ("MDE's") Oil Control Program ("Program") to remediate the Site.

9.      Apex purchased the Pipeline from Chevron in 1994, while Chevron was wrapping up remediation under the MDE Program.  As is typical of this type of transaction, Chevron and Apex (the "Parties") allocated their respective responsibilities under a Purchase and Sale of Assets Agreement ("1994 Agreement" or "Agreement").  A copy of the Agreement is attached as Exhibit B.  The Parties agreed that historical contamination, called "Covered Contamination" under the Agreement, would remain Chevron's responsibility, while any contamination that occurred after the 1994 closing date, called "New Contamination," would be Apex's responsibility.  Additionally, under the Agreement, where the impact of New Contamination exceeds a certain threshold, Apex would be responsible for both Covered and New Contamination.

10.     By the time Chevron sold the Pipeline to Apex in 1994, the Covered Contamination was immobile, in a "residual"[2] form, consistent with the age of the historical release.  Chevron's containment, removal, and other actions concerning the Covered Contamination had achieved stable conditions.

11.     During Apex's operation of the Pipeline, Site subsurface conditions began to change. Monitoring wells that had been free of liquid petroleum during baseline sampling in 1994 began detecting liquid petroleum products, and those products were of a type markedly changed from the

---

[2] "Residual" means low concentrations of petroleum products that are not liquid, are immobile, and typically not recoverable through traditional remediation methods.

historical diesel product.  By 1999, the Plume had developed and also appeared to have become mobile, with product arriving in new locations down-gradient from the Pipeline.

12.     During the next several years, Chevron performed additional containment, removal, and other actions to understand the changing subsurface conditions, re-establish Site stabilization, and mitigate the risks of damage.  Although there were indications of a new source of contamination, Chevron, which was still in MDE's Program, focused its efforts on managing the changing conditions, and ultimately conducted (and paid for) what would become a series of response activities – sometimes emergency – to prevent petroleum from reaching the Harbor.

13.     Since 1994, Apex has discharged petroleum products from the Pipeline, significantly complicating remediation and increasing both removal costs and length of remediation.  New Contamination caused by Defendants caused the Plume of petroleum to migrate across the Site and ultimately discharge to the Harbor on at least two occasions.

14.     In breach of the 1994 Agreement between the Parties that allocated responsibility for contamination, Defendants failed to notify Chevron of New Contamination and to mitigate the impact of releases that caused New Contamination.  Apex has refused and continues to refuse to address the New Contamination that occurred during Apex's ownership of the Pipeline.

15.     Furthermore, Defendants failed to comply with applicable pipeline safety standards that would have prevented or mitigated the resulting damages and harmed Plaintiff by failing to remediate or contribute to costs of remediating contamination resulting from Defendants' releases of petroleum from the Pipeline.

16.     Apex has forced Chevron to remain on Site well beyond the time necessary for Chevron to address Covered Contamination.  To date, Chevron has expended over $30 million on Site remediation with a final Site-wide remedy[3] not yet in place.

17.     Plaintiff seeks indemnification and other relief for Defendants' breach of contract, as alleged in Counts One and Two; removal costs under the Oil Pollution Act of 1990 ("OPA 90"), as alleged in Count Three for Defendants' discharges of oil; contribution from Defendants for their fair share of statutory and common law damages under OPA 90 and the Maryland Uniform Contribution Among Joint Tort-feasors Act ("UCATA"), as alleged in Counts Four and Eight, respectively; injunctive relief for Defendants' failure to comply with federal pipeline safety standards under the federal Pipeline Safety Statute, as alleged in Count Five; and for Defendants' failure to perform containment, cleanup and removal actions; compensatory relief under state negligence, quantum meruit, and the Maryland Pollution Control Act, as alleged in Counts Six, Seven, and Nine through Eleven for past and future remediation costs incurred by Chevron; and declaratory relief pursuant to the federal Declaratory Judgment Act, as alleged in Count Twelve for pre- and post-judgment costs in connection with New Contamination.

**<u>Jurisdiction and Venue</u>**

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the suit involves claims arising under federal law.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the suit involves a controversy between parties of diverse citizenship and the amount in controversy exceeds $75,000.

---

[3] A final remedy would allow MDE to "close" remediation of the Site under the Program, and would effectively end remediation obligations, except for potential ongoing operation and maintenance of the remediation system.

19.     Certain of Plaintiff's claims arise under state law. The Court has supplemental jurisdiction over these claims arising under Maryland state law pursuant to 28 U.S.C. § 1367(a), as they form part of the same case and controversy as Plaintiff's federal statutory claims.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because this district has a substantial connection to the claims asserted.  A substantial part of the events or omissions giving rise to the claims occurred in this district and the property at issue is situated in this district.

21.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(c)(2) because Defendants are subject to the district's personal jurisdiction with respect to this suit and are therefore deemed to reside in this district.

## The Parties

22.     Plaintiff Chevron U.S.A. Inc. is a Pennsylvania Corporation with its headquarters  at 6001 Bollinger Canyon Rd., San Ramon, CA 94583.

23.     Defendant Apex Oil Company, Inc. is a Missouri Corporation with its mailing address at 8235 Forsyth Boulevard, Ste. 400, St. Louis, MO 63105.

24.     Defendant Petroleum Fuel & Terminal Company is a Missouri Corporation with its mailing address at 8235 Forsyth Boulevard, Ste. 400, Clayton, MO 63105.  Petroleum Fuel & Terminal Co., is a subsidiary and/or affiliate of Defendant Apex.

## Factual Background

**Pipeline History**

25.     In 1955, Hoffberger Oil Company installed the Pipeline and sold it to Gulf Oil Corporation.

6

26. In 1979, Gulf released diesel petroleum from the Pipeline. Gulf reported the release to the State of Maryland and undertook response activities associated with the contamination.

27. Chevron merged with Gulf in 1985, acquiring the Pipeline in that transaction and taking Gulf's place in MDE's Oil Control Program. With MDE oversight and pursuant to Program requirements, Chevron continued Gulf's response activities at the Site.

28. Chevron took the Pipeline out of service in November 1989. Before the 1994 sale of the Pipeline to Apex, Chevron conducted tests and inspections to assess the integrity of the Pipeline and the condition of the Site. In July of 1994 the Pipeline passed pressure testing. In October and November of 1994, Chevron conducted a subsurface investigation that documented the baseline soil and groundwater conditions along the Pipeline. That effort identified residual weathered diesel-range petroleum hydrocarbons and small amounts of motor oil in some but not all samples along the Pipeline.

29. Site conditions in 1994 indicated that Chevron was nearing Site closure at that time.

**Chevron's Sale of the Pipeline to Apex**

30. Chevron sold the Pipeline, among other assets, to Apex on September 1, 1994 (the "Closing Date"). Apex has been the sole owner of the Pipeline since September 1, 1994.

31. The 1994 Agreement defines "Covered Contamination" as hydrocarbons or other contamination resulting from spills, leaks, discharges or other releases of petroleum or petroleum products before the Closing Date of the Agreement.

32. The weathered diesel and motor oil identified through baseline sampling in 1994 constitute Covered Contamination.

33. Chevron retained responsibility for Covered Contamination, except where the impact of New Contamination reached a certain threshold.

7

34.     Any post-Closing Date material spill, leak, discharge or other release of petroleum or petroleum products, hydrocarbons or other contamination constitutes "New Contamination" under the Agreement.

35.     Apex's releases since 1994 constitute New Contamination.

36.     Under the Agreement, Apex is responsible for New and Covered Contamination at the Site.

37.     The terms of the Agreement require Defendants to, among other things: (A) promptly notify Chevron of any New Contamination; (B) act promptly to minimize the effects of New Contamination; and (C) provide, upon request of Chevron, records regarding Defendants' compliance with federal, state, and local laws and regulations related to terminal operations.

**Apex's New Contamination and Chevron's Response Activities**

38.     Defendants' use of the Pipeline over the last 20 years caused New Contamination at the Site.  Defendants discharged petroleum to the shorelines adjoining the Harbor, and to the Harbor directly.

39.     The Covered Contamination – comprised of residual diesel from 1979 – could not account for the Plume or changes that occurred after 1994.

40.     Only new and ongoing discharges from the Pipeline could have destabilized subsurface conditions, creating the Plume and causing it to spread, and causing the associated discharges to the Harbor.

41.     Defendants failed to operate and maintain the Pipeline in compliance with state and federal laws and regulations.  Defendants failed to inspect adequately the Pipeline for indications of

discharges or possible discharges.  Defendants failed to investigate and respond promptly to indications of discharges or possible discharges from the Pipeline.

### A.  Apex's Operation of the Pipeline Caused New Contamination

42.     After Apex acquired the Pipeline in 1994, Chevron continued response activities with respect to Covered Contamination.  Chevron's goal was to complete Site remediation and to obtain a no-further-action determination from MDE.  Such a determination would have ended Chevron's remediation obligations at the Site and its participation in the Oil Control Program.

43.     Apex put the Pipeline in service in March of 1995.

44.     Pursuant to MDE Program requirements, Chevron conducted a second round of sampling in the area near the Pipeline in 1997.  Results of the sampling detected the presence of liquid petroleum hydrocarbons in monitoring and gauging locations that in 1994 had been free of liquid petroleum.  The sampling also showed that the newly present petroleum was fresh gasoline, not weathered diesel for which Chevron was responsible under the 1994 Agreement.

45.     Two years later, on October 19, 1999, in the course of routine Site closure activities, Chevron detected liquid petroleum in the stormwater system parallel to and approximately 200 yards from the Pipeline.  This was a location where petroleum from the 1979 Gulf release had not previously been detected.  The presence of liquid petroleum was inconsistent with stable subsurface conditions achieved for Covered Contamination.

46.     Chevron responded immediately to contain the petroleum and prevent discharge to the Harbor, and then conducted an expedited limited investigation to develop a protective solution. Chevron installed a slip-line onto approximately 800 feet of stormwater drain, intended to prevent petroleum from entering the drain and flowing directly to the Harbor.  Following completion of

construction, Chevron performed inspections and installed ten additional monitoring wells to evaluate the apparent subsurface migration of petroleum toward the southern portion of the Site.

47.     From 2000 through 2008, in an effort to better understand the changing subsurface conditions at the Site and again work toward Site closure, Chevron installed additional monitoring wells and conducted periodic gauging and product recovery under MDE's Program.

**B.  Signs of New Contamination in 2009**

48.     Chevron was again nearing Site closure with MDE when in 2009 it began observing petroleum from the groundwater exfiltrating, or seeping, into the Channel on the southern end of the Site.  See the attached Site drawing at Exhibit A.

49.     Chevron worked to contain and recover the petroleum product "seeps," while designing a permanent remedy to prevent ongoing seeps to the Channel.

50.     In 2010, Chevron installed twelve additional monitoring wells and one recovery well to delineate and remove product.  During the same period, Chevron performed product seep clean-up and containment under an MDE-approved Corrective Action and Work Plan.

**C.  Apex Releases Caused Discharges to a Navigable Water of the United States**

51.     On August 15, 2011, some 30 to 40 gallons of petroleum discharged to the Harbor through the drainage Channel.  In coordination with the United States Coast Guard and MDE, Chevron took immediate actions to prevent additional petroleum from reaching the Harbor.

52.     MDE's Emergency Response Division installed roughly 100 feet of boom at the storm drain outfall and sweep around portions of the dock, and Chevron installed 4,100 feet of harbor boom and sweep.

53.     The petroleum released to the Harbor was fully contained by MDE and Chevron's actions on August 15, 2011.  Chevron used drum skimmers, vacuum trucks and boats, and manual labor to remove the petroleum and contaminated debris from the Harbor.  On August 21, 2011, Chevron camera inspected, jet washed, and vacuumed 1,000 feet of storm drain to ensure removal of any product trapped in the storm drain.

54.     Currently, Chevron conducts daily Harbor inspections, maintains at least one boom at the Harbor outfall at all times, and operates dewatering and water treatment systems when necessary.

55.     Apex's ongoing releases from the Pipeline caused petroleum to discharge to a navigable water of the United States, and to an adjoining shoreline.

### D.  Apex Discovered a Large Crack in the Pipeline in 2012

56.     In February of 2012, Apex excavated and inspected parts of the Pipeline.  Apex observed petroleum in the ground at various locations along the Pipeline that Apex identified as the same product it had recently moved through the Pipeline.

57.     Apex initially reported to MDE the presence of a "pinprick" in the Pipeline.  Later Apex reported to MDE the existence of a crack and noted the presence of significant corrosion in the Pipeline. The report does not state when the crack developed.

58.     Apex removed and replaced the cracked portion of the Pipeline during the week of February 25, 2012.

59.     Despite MDE's and the Maryland Pipeline Safety Commission's ("PSC's") request to be present, Apex conducted the work on a Sunday, with neither MDE nor PSC personnel in attendance.

60.     On February 29, 2012, Apex notified MDE of a split seam in the Pipeline.

61.     Apex observed petroleum in the excavation into the beginning of March 2012.

11

62.     MDE requested a report of findings from Apex in March 2012, and Apex provided that report on May 15, 2012 (the "May 2012 Report").  The May 2012 Report indicated that there were four additional anomalies to be addressed in the future and that Apex removed 163.57 tons of petroleum-contaminated soil during the Pipeline excavation.

63.     In August 2012, Apex prepared another report titled "Report: Failure Analysis of Pipe Carrying Petroleum Products Between Two Terminals" (the "August 2012 Report").  The August 2012 Report concedes "aggressive corrosion" near the crack, but claims, with no factual or technical basis, that any evidence of a spill is likely from "another section of the pipe or another source altogether."

64.     On September 26, 2012, MDE issued a Notice of Violation to Apex related to the 2012 events.

65.     Even after Apex's 2012 Pipeline repairs, Chevron continued to encounter problems with the Plume, including (1) petroleum discharging from stormwater piping to the stormwater channel and the Harbor in September 2012, (2) petroleum in the Channel in October 2012, (3) petroleum near the new stormwater system in November 2012, (4) petroleum in the stormwater piping in January 2013, and (5) petroleum surface seeps in the summer of 2013.

**Apex is Responsible for the Plume**

66.     Multiple Apex releases from the Pipeline have created the Plume of petroleum hydrocarbons at the Site.  This New Contamination migrated toward and along the Site's drainage Channel.  The Plume now covers approximately 20 acres and is estimated to contain approximately 750,000 gallons of free product.

67.     The Plume contains petroleum products that are more diverse than the product detected in the Covered Contamination in 1994, when Chevron sold the Pipeline to Defendants.  Among the newer

constituents, the Plume contains methyl tertiary butyl ether ("MTBE"), a gasoline additive that was not present before Apex purchased the Pipeline.

68.     Site hydrogeology indicates that without additional releases, the existing historical contamination would have remained immobile, in a residual state.  Without the arrival of New Contamination from Apex, Chevron would have obtained Site-closure under MDE's Oil Control Program and would no longer be working on Site.

69.     Based on both hydrogeology and chemistry, the Plume – in its current location and composition – could not have resulted from Covered Contamination, including residuals from the 1979 Gulf release.

70.     The New Contamination caused by Apex's post-1994 releases increased both Chevron's remaining costs for corrective work and the remaining time required to complete that corrective work by more than fifty percent (50%).

71.     Defendants failed to notify Chevron of any releases, and failed to act promptly to address those releases.

72.     When Chevron requested records from Apex on July 8, 2014, pursuant to the 1994 Agreement, Apex failed to provide those records.

73.     Apex took the Pipeline out of service in the fall of 2013.

74.     Since that time, product seeps have declined.

75.     Despite Apex's responsibility for discharges at the Site, Apex has not assisted with or participated in remediation at the Site.  Apex also refuses to participate in or contribute to costs associated with future remediation.

76.     Chevron continues to conduct remedial action related to the Plume, in accordance with the State Oil Control Program.

## Nature of the Claims

77.     Defendants caused or allowed discharges or threatened discharges from the Pipeline, without notification to Chevron, and that have hindered Chevron's remediation efforts at the Site, substantially increased Chevron's costs and length of time remediating the Site, and exacerbated the impact of the contamination.  In breach of the 1994 Agreement, Defendants have failed to take responsibility for New Contamination on Site.  Although Defendants were aware of their contributions to the Plume, Defendants failed to properly inspect, investigate, control, and remediate discharges from the Pipeline.  Defendants violated federal and state laws and regulations concerning the discharge of petroleum and remediation related thereto that has caused damage to Chevron's ongoing remediation efforts at the Site.

## COUNT ONE: BREACH OF CONTRACT

78.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

79.     On or around September 1, 1994, Defendants entered into a contract with Chevron to purchase the Pipeline – the 1994 Agreement.

80.     The 1994 Agreement defines "Covered Contamination" as hydrocarbons or other contamination resulting from spills, leaks, discharges or other releases of petroleum or petroleum products before the Closing Date.

81.     The 1994 Agreement defines "New Contamination" as hydrocarbons or other contamination resulting from spills, leaks, discharges or other releases of petroleum or petroleum products after the Closing Date.

14

82.     Under the terms of the Agreement, Defendants are contractually obligated to (A) promptly notify Chevron of New Contamination; (B) act promptly to minimize the effects of New Contamination; and (C) provide, upon request of Chevron, records regarding Defendants' compliance with federal, state, and local laws and regulations related to its operations.

83.     Defendants breached each of these contractual obligations to Chevron.

84.     Defendants failed promptly to notify Chevron of New Contamination.

85.     Defendants failed to act promptly to minimize the effects of New Contamination, including, but not limited to, New Contamination from the crack Apex discovered in February 2012.

86.     Defendants failed to provide records in response to Chevron's July 8, 2014 request for documents to determine Defendants' compliance with federal, state, and local laws and regulations related to its operations.

87.     As a result of Defendants' breaches, Chevron has incurred and continues to incur damages and removal costs for actions taken in response to New Contamination from the Pipeline, including but not limited to (1) the costs of addressing petroleum impacts to the stormwater pipeline in 1999, (2) petroleum seeps in the stormwater drainage swale in and around 2009, (3) resulting contamination from the 2012 Pipeline release, and (4) costs of addressing the Plume and its general migration and remediation.

88.     Under the Agreement, Chevron is entitled to recover costs of remediation and expenses, as well as reasonable attorneys' fees.

## COUNT TWO: CONTRACTUAL INDEMNITY OBLIGATION

89.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

90.     Chevron is the indemnitee under Sections 12.8 and 12.10 of the 1994 Agreement, and, thereby, has various rights with respect to indemnification of Chevron's costs and expenses for addressing both Covered Contamination and New Contamination.

91.     Apex failed to notify, act promptly to minimize the effects of the New Contamination, and hire a mutually acceptable consultant to assess the effect of the New Contamination.  Apex also failed to remediate the New Contamination.

92.     The New Contamination caused by Apex's post-closing releases have increased by more than fifty percent (50%) Chevron's remaining costs for corrective work and/or the remaining time required to complete that corrective work.  Apex's failure has materially affected Chevron's ability to carry out its obligations regarding the Covered Contamination.

93.     Pursuant to Section 12.8 of the Agreement, Apex "thereafter shall release, indemnify and holder [Chevron] harmless from and against all claims, expenses (including attorneys' fees), loss and liability arising from the such Covered Contamination as well as from the New Contamination."

94.     Pursuant to Section 12.10 of the Agreement, Chevron "shall not be liable or responsible for any penalties imposed by any applicable governmental authority due to [Apex's] failure to conform with any federal, state and local laws and regulations. … [and Apex] agrees to indemnify [Chevron] for any expenses (including reasonable attorneys' fees) incurred arising from such penalty."

95.     As a result, Chevron is entitled to indemnification by Apex under the Agreement for all claims, expenses (including reasonable attorneys' fees), losses and liabilities arising from the Covered Contamination and the New Contamination.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

**COUNT THREE: VIOLATION OF OPA 90 – COST RECOVERY CLAIM**

96.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

97.     OPA 90 permits parties to bring claims for removal costs and damages associated with a discharge of oil or a substantial threat of a discharge of oil.  33 U.S.C. § 2713.

98.     Each Defendant is a "person" within the meaning of OPA 90, 33 U.S.C. § 2701(27).

99.     The Pipeline currently owned and operated by Defendants is a "facility" within the meaning of OPA 90, 33 U.S.C. § 2701(9).

100.    As the current owner and operator of the Pipeline, each Defendant is a "responsible party" within the meaning of OPA 90, 33 U.S.C. § 2701(32)(E).

101.    The Harbor is a "navigable water" of the United States within the meaning of OPA 90, 33 U.S.C. § 2701(21).

102.    The Site is an adjoining shoreline and/or adjoins the shorelines to the Harbor.

103.    Apex's discharges of oil, dating back to its purchase of the Pipeline in 1994, and the continued threat of discharges of oil from the Pipeline, have impacted and continue to threaten impact to the adjoining shorelines and navigable waters of the Harbor, and constitute violations of OPA 90.

104.    Chevron has incurred and continues to incur damages and removal costs for actions taken in response to the discharges of oil and the substantial threat of discharges of oil from the Pipeline to the adjoining shorelines and navigable waters of the Harbor.  Actions taken by Chevron are consistent with the provisions of the National Contingency Plan that apply to OPA 90.

105.    Apex's acts and/or omissions were the sole cause of its discharges and substantial threat of discharge resulting in damages and removal costs, and did not occur in connection with any contractual relationship with Chevron.

106.     Chevron exercised due care with respect to the oil concerned, taking into consideration the characteristics of the oil and in light of all relevant facts and circumstances.

107.     Chevron also took precautions against Apex's foreseeable acts and/or omissions and the foreseeable consequences of those acts and/or omissions.

108.     Pursuant to 33 U.S.C. § 2713(c)(2), Chevron provided notice of these violations to Defendants on September 30, 2014, more than ninety (90) days before the filing of this Complaint (the "Notice").  A copy of the Notice is attached as Exhibit C.

109.     Defendants have not settled with Chevron within the 90-day period prescribed in 33 U.S.C. § 2713(c)(2).

110.     As a result, Chevron is entitled to recover from Defendants removal costs and damages associated with a discharge of oil or a substantial threat of a discharge of oil.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

### COUNT FOUR: VIOLATION OF OPA 90 – CONTRIBUTION CLAIM

111.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

112.     Under OPA 90, a party may bring a civil action for contribution for removal costs and damages associated with a discharge of oil or a substantial threat of a discharge of oil against any other party that is liable or potentially liable under OPA 90 or another law.  33 U.S.C. § 2709.

113.     Each Defendant is a person liable or potentially liable for discharges of oil from the Pipeline to the Site and the Harbor under the OPA 90 or another law, including but not limited to, the Pipeline Safety Statute, 49 U.S.C. § 60121(a)(1), state common law claims of quantum meruit based on implied-in-law contract/unjust enrichment, quantum meruit based on implied-in-fact contract, negligence per se, and negligence, the Maryland UCATA, Md. Code ANN., CTS. & JUD. PROC.§ 3-

18

1402(b), the Maryland Pollution Control Act, Md. Code ANN., ENVIR. § 4-419(a), the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), and Md. Code ANN., ENVIR. § 9-322.  33 U.S.C. § 2702.

114.    Acting pursuant to 33 U.S.C. § 2713(c)(2), Chevron provided notice of violations to

Defendants on September 30, 2014, more than ninety (90) days before the filing of this Complaint.  A

copy of the Notice is attached as Exhibit C.

115.    Defendants have not settled with Chevron within the 90-day period prescribed in 33

U.S.C. § 2713(c)(2).

116.    Chevron is entitled to contribution under OPA 90 because Chevron has established

Defendants' liability under the OPA 90 and other laws.  Chevron has spent more than $30 million on

remediation to date, and damages and removal costs continue to accrue.

## COUNT FIVE: VIOLATION OF PIPELINE SAFETY STATUTE

117.    Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

118.    The Pipeline Safety Statute permits private parties to bring an action for injunctive relief

against a person who is in violation of the Pipeline Safety Statute, its regulations, or an order issued

under the Statute.  49 U.S.C. § 60121(a)(1).

119.    The Pipeline Safety Statute requires pipeline owners to inspect, maintain, detect

discharges, and repair their pipelines and to prepare and follow a manual for operations, maintenance,

and emergency that includes procedures for controlling discharges of product.  49 U.S.C. § 60108; 49

C.F.R. §§195.400 - 195.446.

120.    Defendants' failure to comply with the Pipeline Safety Statute and its related regulations,

including, but not limited to, Defendants' failure to comply with applicable safety standards for

inspecting, maintaining, testing, detecting discharges, and making timely Pipeline repairs, as well as its

failure to follow a manual for operations, maintenance, and emergency for controlling discharges related to the 2012 Pipeline discharge, violates the Pipeline Safety Statute.

121.     Acting pursuant to 49 U.S.C. § 60121(a)(1)(A), Chevron presented its claims to the Maryland Public Service Commission and Defendants on September 30, 2014, more than sixty (60) days before the filing of this Complaint.  A copy of the Notice is attached as Exhibit C.

122.     Chevron is entitled injunctive relief requiring Apex to correct these violations, reasonable attorneys' fees, expert witness fees, and costs.

## COUNT SIX: NEGLIGENCE PER SE

123.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

124.     Defendants discharged petroleum from their Pipeline in violation of a number of statutes and regulations, including but not limited to the statutes and regulations referenced in this Complaint. Each of these statutes and regulations is designed to protect public health, safety and the environment.

125.     During that time, Chevron was responsible only for Site remediation of the 1979 Gulf release under MDE's Oil Control Program, and has been and continues to be injured by remediating Defendants' discharges of petroleum.

126.     Defendants' unreasonable and unnecessary violations were the proximate cause of Chevron's injuries.

127.     Due to the violations of the statutes and regulations that were caused by Defendants' negligence, Chevron has sustained damages as described throughout this Complaint, including but not limited to, the past, present and future cost of remediation at the Site.

128.    As a result, Chevron is entitled to recover damages from Apex in form of past, present and future remediation costs.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

## COUNT SEVEN:  NEGLIGENCE

129.    Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

130.    Defendants have owned and operated the Pipeline since 1994.

131.    Defendants knew or should have known that Defendants' discharges from the Pipeline presented an unreasonable risk of harm to Chevron and Chevron's remediation efforts.

132.    Defendants owed and continue to owe a duty to Chevron to "promptly notify" Chevron of any releases from the Pipeline as provided in Section 12.8 of the 1994 Agreement, as well as to pay its cost of remediation and to indemnify Chevron, under the same Agreement.

133.    Defendants owed and continue to owe a duty to Chevron to exercise ordinary care in maintaining, inspecting, operating, and preventing the discharge of petroleum from the Pipeline.

134.    Defendants owe and continue to owe a duty to Chevron to adhere to federal and state statutes and regulations, including OPA 90, federal pipeline safety standards, and the Maryland Pollution Control Act.

135.    Defendants owed and continue to owe Chevron a duty to investigate and remediate promptly Defendants' discharges from the Pipeline.

136.    Defendants owed and continue to owe a duty to warn Chevron of the damages Chevron has incurred as a result of Defendants' discharges of petroleum from the Pipeline.

137.    Defendants breached these duties by:

  a. Failing to operate and maintain the Pipeline in a manner preventing discharges or possible discharges;

  b. Failing to inspect the Pipeline for indications of discharges or possible discharges;

  c. Failing to investigate promptly indications of discharges or possible discharges;

  d. Failing to warn and/or notify Chevron of discharges or possible discharges;

  e. Failing to respond promptly to the discharge or threat of discharge of product from the Pipeline.

138. Defendants' breaches placed it on constructive notice of Defendants' discharges from the Pipeline and/or associated equipment (including the Clinton Street Terminal) that contributed to the Plume, and Chevron presented its claims to Defendants on September 30, 2014.  A copy of the Notice is attached as Exhibit C.

139. Chevron remediated and continues to remediate Defendants' Plume.

140. Defendants' actions and/or omissions caused and continue to cause actual injury and loss to Chevron, by causing Chevron to investigate, remediate, and pay for remediation of Defendants' discharges from the Pipeline and/or associated equipment.

141. Defendants' breaches hindered Chevron's efforts environmentally and economically. Chevron's remediation expenditures, made pursuant to State requirements, resulted proximately from Defendants' negligence.  Chevron has no other continued interest at the Site as Chevron is neither the Site owner, nor the owner or operator of the Pipeline.  But for Defendants' negligence, Chevron's remediation efforts at the Site would have been complete long ago.

142. Chevron has incurred damages due to Defendants' negligence in an amount to be determined at trial.

143. As a result, Chevron is entitled to recover damages from Apex in the form of past, present and future remediation costs. Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

## COUNT EIGHT: MARYLAND UNIFORM CONTRIBUTION AMONG JOINT TORT-FEASORS ACT

144. Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

145. The Maryland Uniform Contribution Among Joint Tort-feasors Act ("UCATA") permits private parties to obtain contribution from a joint tort-feasor. MD. CODE ANN., CTS. & JUD. PROC. § 3-1402(b).

146. Chevron and Defendants are joint tort-feasors as defined in Md. Code ANN., CTS. & JUD. PROC. § 3-1401 (c).

147. Chevron is liable for the 1979 Gulf release under MDE's Oil Control Program.

148. Defendants are responsible for Defendants' negligent discharges of petroleum occurring during Defendants' ownership and operation of the Pipeline, from 1994 to the present.

149. Defendants are responsible for the Plume.

150. Chevron has been addressing contamination at the Site since before Apex's 1994 purchase of Pipeline.

151. Chevron continues to remediate the Plume and discharge more than its share of the liability to the State, costs totaling more than $30 million to date.

152. Chevron continues to pay more that its *pro rata* share of the common liability to remediate the Plume.

153.    Defendants should be ordered to pay their *pro rata* share of past and future costs associated with remediation of the Plume.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

### COUNT NINE: VIOLATION OF MARYLAND POLLUTION CONTROL ACT

154.    Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

155.    The Maryland Pollution Control Act permits a party that assists in controlling the discharge of another party to be relieved of associated costs.  MD. CODE ANN., ENVIR. § 4-419(a).

156.    Defendants are liable for containment, cleanup, removal costs, and damages born by Chevron.

   a.   Each Defendant is a "responsible party" as defined by OPA 90 as the current owner and operator of the Pipeline.

   b.   Each Defendant is a "person responsible for discharge" as defined by MD. CODE ANN., ENVIR. §4-401(j) as the owner of all product discharged from the Pipeline since 1994; the owner, operator, and person in charge of the Pipeline involved in all product discharged since 1994; and the person who through acts and/or omissions caused the discharges since 1994.

   c.   Defendants have engaged in grossly negligent and willful misconduct related to the Pipeline, including, but not limited to Defendants' grossly negligent inspection, repair, and maintenance of the Pipeline.

157.    Chevron is not liable for the costs of containment, cleanup, and removal of Defendants' discharges.

24

    d.   Chevron is not a "person responsible" for Defendants' discharges as defined by MD. CODE ANN., ENVIR. § 4-401(j) as Chevron is not the owner of any product discharged from the Pipeline since 1994; Chevron is not the owner, operator, or person in charge of the Pipeline involved in any product discharged from the Pipeline since 1994; and Chevron did not through any act and/or omission cause any discharge from the Pipeline since 1994.

    e.   Chevron is not a "responsible party" as defined by OPA 90, 33 U.S.C. § 2701 (32), as Chevron is not the owner or operator of the Pipeline.

    f.   Chevron's actions at the Site, including, but not limited to Chevron's remedial actions, are not and have not been grossly negligent, nor has Chevron engaged in willful misconduct related to its actions at the Site.

158.    Chevron's remedial actions at the Site are consistent with the Maryland Pollution Control Act, the National Contingency Plan, and other State requirements.

159.    Because Chevron is not liable for the costs of containment, cleanup, and removal of discharges at the Site since 1994, Chevron should be relieved of and reimbursed for all costs of containment, cleanup, and removal of discharges at the Site since 1994.

160.    Defendants are therefore liable for all containment, cleanup, and removal costs and damages that Chevron is relieved of and Chevron is accordingly entitled to reimbursement from Defendants.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

## COUNT TEN: QUANTUM MERUIT BASED ON IMPLIED-IN-LAW CONTRACT/ UNJUST ENRICHMENT

161.    Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

162.     Pursuant to the State Oil Control Program, Chevron has been remediating the 1979 Gulf release.

163.     In accordance with State requirements, Chevron has continued to remediate the 1979 Gulf release during Defendants' ownership and operation of the Pipeline.  During this time, remediation activity and expenditures have been in response to the Apex's discharges.

164.     During Defendants' ownership and operation of the Pipeline, Defendants contributed to and continued to contribute to the Plume.

165.     Defendants are responsible for contributions to the Plume stemming from their ownership and operation of the Pipeline beginning in 1994.

166.      Defendants are aware and have knowledge that Chevron has been on Site remediating the Plume since before Defendants' 1994 purchase of the Pipeline.

167.     Defendants accepted and allowed Chevron to remediate contamination that Defendants knew or should have known was Defendants' responsibility.

168.     Defendants have received the benefit of Chevron's continued remediation at the Site.

169.     Defendants' knowledge and continued contributions to the Plume make it inequitable for Defendants to retain the benefit of Chevron's remediation efforts.

170.     Chevron has been damaged as a direct and proximate result of Defendants' actions.

171.     As a result, Chevron is entitled to recover damages from Apex in the form of past, present and future remediation costs.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

**COUNT ELEVEN: QUANTUM MERUIT BASED ON IMPLIED-IN-FACT CONTRACT**

172.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

26

173.     Pursuant to the State Oil Control Program, Chevron remediated the Plume during Defendants' ownership and operation of the Pipeline.

174.     During Defendants' ownership and operation of the Pipeline, Defendants contributed to and continue to contribute to the Plume.

175.     Defendants are aware and have knowledge that Chevron's remediation efforts have remediated and continue to remediate the Plume that is Defendants' responsibility.

176.     Most recently, on July 8, 2014, Chevron notified Defendants of Chevron's remediation efforts that directly assisted Defendants.  Chevron expressed an expectation of payment for those efforts by requesting that Defendants contribute their share to the remediation efforts at the Site.

177.     Defendants refused to provide remediation assistance.

178.     Defendants' refusal benefitted Defendants and constitutes acceptance, use, and enjoyment of Chevron's remediation efforts at the Site.

179.     As a result, Chevron is entitled to recover damages from Apex in the form of past, present and future remediation costs.  Chevron has spent more than $30 million on remediation to date, and damages and removal costs continue to accrue.

## COUNT TWELVE: DECLARATORY JUDGMENT

180.     Chevron incorporates the allegations in paragraphs 1-77 as if set forth fully here.

181.     There is an actual, present and practical need for declaratory relief because Chevron's claims under Maryland contract law, OPA 90, the Pipeline Safety Statute, Maryland common law, Maryland UCATA, and the Maryland Pollution Control Act, are actual controversies within the Court's jurisdiction about the rights and obligations of the Parties that are real and substantial, and involve a genuine conflict of tangible interests, as required by 28 U.S.C. §2201.

182.     Chevron is entitled to a judgment declaring that Defendants must pay Chevron damages for breach of contract and to indemnify Chevron for all claims, expenses (including attorneys' fees), losses and liabilities arising from Defendants' releases of petroleum at the Site;

183.     Chevron is entitled to a judgment declaring that Defendants must cease contributions to the Plume and must prevent migration of product and related contaminants at the Site.

184.     Chevron is entitled to a judgment declaring that Defendants must adhere to federal and state statutes and regulations.

185.     Chevron is entitled to a judgment declaring that Defendants must pay damages to Chevron for loss of profits and impairment of earning capacity for resources spent on Defendants' remediation that could have been used elsewhere.

186.     Chevron is entitled to a judgment declaring that Defendants must pay their *pro rata* share of past and future costs associated with ongoing remediation of the Plume.

187.     Chevron is entitled to a judgment declaring Defendants liable for future costs that may be incurred by Chevron for cleanup of the Plume or any other damages incurred by Chevron associated with the Pipeline.

## PRAYER FOR RELIEF

188.     WHEREFORE, Chevron respectfully requests that this Court order Defendants to appear and answer, and on final resolution of this cause:

     a.   Award Chevron damages for Defendants' breach of contract and/or for Defendants' failure to indemnify Chevron under the contract;

     b.   Order Defendants to adhere at this Site to the federal and state statutes and regulations described in this Complaint;

c.  Issue a judgment of liability against Defendants for all past and present removal costs; contribution; damages, including, but not limited to, damages to loss of profit and earning capacity for resources spent on remediating Defendants' contamination that could have been spent elsewhere; and interest in an amount to be determined at the time of trial;

d.  Issue a declaratory order on liability, which will be binding in any subsequent action or actions to recover future removal costs and damages;

e.  Award Chevron its costs of litigation, including attorneys' fees, expert witness fees, and pre- and post-judgment interest, at the highest rate allowed by law, incurred in assessing Chevron's damages and instituting suit to mitigate Defendants' contamination; and

f.  Grant such other legal or equitable relief as this Court deems proper.

Dated February 6, 2015

MORGAN, LEWIS & BOCKIUS LLP

BY:   _____
Ronald J. Tenpas
USDC Maryland Bar I.D. 14448
Steven A. Luxton
USDC Maryland Bar I.D. 25894
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone:  (202) 739-3000
Fax:      (202) 739-3001
E-mail: rtenpas@morganlewis.com
         sluxton@morganlewis.com

BEVERIDGE & DIAMOND, P.C.

Robert Brager
USDC Maryland Bar I.D. 8404
Evynn M. Overton
USDC Maryland Bar I.D. 06140
201 N. Charles Street, Ste. 2210

Baltimore, MD  21201
Phone:  (410) 230-1300
Fax:      (410) 230-1389
E-mail: rbrager@bdlaw.com
            eoverton@bdlaw.com


**ATTORNEYS FOR PLAINTIFF**

**JURY DEMAND**

Plaintiff demands a jury for all issues triable by jury.


Dated February 6, 2015                    **MORGAN, LEWIS & BOCKIUS LLP**

BY:    _Rudd / Tenpas_
       Ronald J. Tenpas
       USDC Maryland Bar I.D. 14448
       Steven A. Luxton
       USDC Maryland Bar I.D. 25894
       1111 Pennsylvania Avenue, N.W.
       Washington, DC 20004
       Phone:  (202) 739-3000
       Fax:     (202) 739-3001
       E-mail: rtenpas@morganlewis.com
                sluxton@morganlewis.com


             **BEVERIDGE & DIAMOND, P.C.**

       Robert Brager
       USDC Maryland Bar I.D. 8404
       Evynn M. Overton
       USDC Maryland Bar I.D. 06140
       201 N. Charles Street, Ste. 2210
       Baltimore, MD  21201
       Phone:  (410) 230-1300
       Fax:     (410) 230-1389
       E-mail: rbrager@bdlaw.com
                eoverton@bdlaw.com


             **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2015 Plaintiff's Complaint was filed electronically using the Court's electronic filing system, and a courtesy copy of the Complaint will be mailed to the following parties.  The following parties will be served within 120 days of today's date, in accordance with Federal Rules of Civil Procedure 4(h) and 4(m).

**Apex Oil Company, Inc.**
8235 Forsyth Boulevard, Ste. 400
St. Louis, MO 63105

*Defendant*

**Petroleum Fuel & Terminal Company**
8235 Forsyth Boulevard, Ste. 400
St. Louis, MO 63105

*Defendant*

MORGAN, LEWIS & BOCKIUS LLP

BY:

Ronald J. Tenpas
USDC Maryland Bar I.D. 14448
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone:  (202) 739-3000
Fax:      (202) 739-3001
E-mail: rtenpas@morganlewis.com