IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| CHEVRON U.S.A. INC., | * | |
| | * | |
| v. | * | Civil No. JFM-15-00341 |
| | * | |
| APEX OIL COMPANY, INC., et al. | * | |
| | * | |
| | ****** | |

## MEMORANDUM

Plaintiff Chevron U.S.A. Inc. ("Chevron") brings this lawsuit against Apex Oil Company,

Inc. ("Apex") and Petroleum Fuel & Terminal Company ("PF&T") (collectively "defendants"),

seeking to recover damages that Chevron incurred as a result of contamination from an

underground pipeline allegedly owned and operated by defendants in southeast Baltimore.

Chevron brings claims under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701 *et seq.*; the

Pipeline Safety Act ("PSA"), 49 U.S.C. § 60121 *et seq.*; the Maryland Environmental Article,

Md. Code Ann., Envir. § 4-401 *et seq.*; and Maryland common law.  (ECF No. 1).  Pending is

defendants' motion to dismiss all claims against them.  (ECF No. 16).   The motion is fully

briefed, and no oral argument is necessary.  *See* Local Rule 105.6.  For the reasons set forth

below, the motion to dismiss is granted in part and denied in part.

## BACKGROUND

This dispute involves alleged ongoing releases of petroleum products from an

underground pipeline (the "Pipeline") in southeast Baltimore, adjacent to Baltimore's Harbor

(the "Harbor").  (ECF No. 1 ¶ 1).  The Pipeline is 3.1 miles long, running east from a terminal on

South Clinton Street to another terminal on Erdman Avenue.  (*Id.*)  Chevron's complaint

concerns the portion of the Pipeline that runs between South Clinton and South Haven Streets

1

and parallel to the northern boundary of property at 1801 South Clinton Street (the "Site"), which is owned by a third party.  (*Id.*)  Gulf Oil Corporation ("Gulf") originally owned the Pipeline, but Chevron acquired it when the two companies merged in 1985.  (*Id.* ¶¶ 25-27).  As a result of the merger, Chevron also took responsibility for Gulf's 1979 diesel release from the Pipeline, and entered into the Maryland Department of the Environment's ("MDE's") Oil Control Program to remediate the contamination.  (*Id.* ¶ 8).

Chevron alleges that defendants have owned and operated the Pipeline since September 1994, when they purchased it from Chevron.  (*Id.* ¶¶ 1, 9).  In a Purchase and Sale of Assets Agreement (the "Agreement"), the parties also agreed to the following:  contamination occurring before the closing date of the Agreement, called "Covered Contamination," would remain Chevron's responsibility, whereas contamination occurring after that date, called "New Contamination," would be the responsibility of the buyer.  (*Id.* ¶ 9).  The parties also agreed that if the impact of any New Contamination exceeded a certain threshold, the buyer would bear responsibility for both Covered and New Contamination.  *Id.*  Under the Agreement, the buyer was also required to promptly notify Chevron of any New Contamination, promptly act to minimize such contamination, and provide records, upon Chevron's request, concerning its compliance with laws and regulations related to its operation of the Pipeline.  (*Id.* ¶ 37).

Chevron alleges that defendants have violated federal and state laws governing the discharge of petroleum, have caused petroleum discharges from the Pipeline, and bear responsibility for costs associated with remediating the contamination.  (*See id.* ¶ 77).  According to Chevron, it has incurred costs in excess of $30 million and continues to incur substantial costs to remediate the Site.  (*Id.* ¶ 3, 16).

Chevron filed a complaint in this court on February 6, 2015.  The complaint asserts twelve counts, each against both defendants:  breach of contract (Count I), contractual indemnification (Count II), cost recovery and contribution under the OPA (Counts III and IV); injunctive relief under the PSA (Count V); common law tort claims (Counts VI, VII, and VIII); cost recovery under Section 4-419 of the Maryland Environmental Article (Count IX); quasi-contractual relief (Counts X and XI); and declaratory relief (Count XII).  Defendants filed a motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of all twelve counts.  (ECF No. 16).

## STANDARD

Pursuant to Rule 12(b)(1), defendants contend that this Court lacks subject matter jurisdiction over several of Chevron's claims.  A plaintiff carries the burden of proving that subject matter jurisdiction exists.  *See Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).  When a defendant brings a Rule 12(b)(1) facial challenge, as the defendants do here, the district court "must apply a standard pattered on Rule 12(b)(6) and assume the truthfulness of the facts alleged."  *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).  The court should grant the Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotations and citation omitted).

Defendants also move to dismiss several of Chevron's claims under Rule 12(b)(6).  To survive a motion to dismiss under this rule, a complaint must contain sufficient facts "to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (internal quotations and citation omitted).  When ruling on a 12(b)(6) motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences

derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Accordingly, although the plaintiff need not provide "detailed factual allegations," it must "provide the grounds of [its] entitlement to relief" with "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

**ANALYSIS**

Defendants move to dismiss each of the twelve counts in Chevron's complaint.  This section is organized by type of claim rather than by count to more efficiently address the merits of the motion to dismiss.

## I.      Apex as a defendant

As a preliminary matter, defendants contend that Apex should be dismissed because it is not a proper defendant.  At the outset of the complaint, Chevron defines Apex and PF&T "collectively as either 'Apex' or 'defendants.' "  (ECF No. 1 ¶ 1).  Thereafter, throughout the complaint, Chevron makes each of its allegations against the moniker "Apex" or "defendants." (*Id.* ¶¶ 1-188).  In their motion to dismiss, defendants argue that this "lumping" of the two entities is impermissible because Chevron failed to allege facts sufficient to pierce the corporate veil and hold Apex liable for its subsidiary PF&T, and because Chevron failed to specify the basis of each claim against each entity.  (ECF No. 16, pp. 9-11).

As to defendant's argument that Chevron failed to allege facts sufficient to justify piercing the corporate veil, defendants are, of course, correct that absent extraordinary circumstances, a parent corporation is not liable for the acts of its subsidiary. *See Antonio v. Sec. Serv. Of Am., LLC*, 701 F. Supp.2d 749, 759 (D. Md. 2010).  And Chevron does not contest that the complaint is devoid of any facts suggesting piercing the veil may be appropriate, let alone

4

facts to overcome the "strong presumption of [the parent's] limited liability." *Betof v. Suburban Hosp., Inc.*, No. 11-1452, 2012 WL 2564781, at *5 (D. Md. June 29, 2012) (internal quotations and citation omitted).  But Chevron does not seek to hold Apex liable on the theory that it is PF&T's parent.  Rather, it proceeds on the theory that both entities, because they own and operate the Pipeline, are liable for costs resulting from the leaking petroleum product.

To that end, Chevron alleges that both Apex and PF&T have "owned and operated" the Pipeline since "Apex purchased [it] from Chevron in 1994" (ECF No. 1 ¶ ¶ 1, 9); Chevron then proceeds to bring each of its claims against the defendants collectively.[1]  Critically, however, the allegation that both Apex and PF&T own the Pipeline conflicts with other allegations in its complaint, and with Chevron's own attached exhibit.  For Chevron also alleges that "Apex" (which it had defined as *both* Apex and PF&T) "has been the *sole* owner of the Pipeline since September 1, 1994."  (ECF No. 1 ¶ 30) (emphasis added).  And the Agreement (which Chevron attached to its complaint) is signed by Chevron and PF&T alone.  Apex is not a party to the contract, and the contract contains no references to Apex.  Although Chevron now argues that Apex and PF&T publicly represent themselves in ways that support its allegations, and attaches various exhibits in support of this argument, the Court cannot consider these documents.  *See Moore v. Hanger Prosthetics & Orthotics, Inc.*, No. 11-02448, 2011 WL 5873070, at *5 (D. Md.

---

[1] Defendants assert that such group pleading necessarily violates Rule 8(a).  But "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant," as Chevron has done here. *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-639, 2015 WL 4040882, at *3 (S.D.N.Y. July 2, 2015) (internal citation and quotation omitted); *see also Sprint Solutions, Inc. v. Fils-Amie*, 44 F. Supp.3d 1224, 1227 (S.D. Fla. 2014) ("a plaintiff may plead claims against multiple defendants by referring to them collectively"); *Frazier v. U.S. Bank Nat. Ass'n*, No. 11-8775, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013) ("Although Plaintiff refers to [defendants] collectively, Plaintiff has provided sufficient factual detail about the nature of his allegations and about each defendant to provide fair notice of his claims.").  Thus, Chevron's claims against Apex do not fail merely because Chevron grouped the defendants in order to bring identical claims against each of them.

Nov. 21, 2011) (declining to consider allegations and exhibits attached to plaintiff's opposition motion because "plaintiff is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint.") (internal citation and quotation omitted).

The fact that Chevron makes the conclusory allegation that both Apex and PF&T own the Pipeline—when facts alleged elsewhere in the complaint suggest otherwise, and its own exhibit shows otherwise—is not enough.  It is well-established that "[w]hen the bare allegations of the complaint conflict with any exhibits or other documents, whether attached or adopted by reference, the exhibits or documents prevail." *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp.2d 678, 683 (D. Md. 2001) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).  Likewise, "when a complaint contains inconsistent and self-contradictory statements, it fails to state a claim." *Hosack v. Utopian Wireless Corp.*, No. 11-0420, 2011 WL 1743297 at *5 (D. Md. May 6, 2011).  Accordingly, each count in Chevron's complaint is dismissed as to Apex.[2]

## II.    Statutory Claims

Chevron brings four statutory claims against PF&T: two under the OPA, one under the PSA, and one under the Environmental Article of the Maryland Code.  This section addresses each in turn.

### A.  OPA Claims

Counts III and IV assert cost recovery and contribution claims under the OPA.  (ECF No. 1 ¶ 96-116); *see* 33 U.S.C. § 2701 *et seq.*  The statute imposes strict liability on parties that

---

[2] Chevron may file an amended complaint within 15 days of the entry of this opinion.  If it contends that Apex was a party to the contract, it must allege specific facts supporting that contention.  If it concedes that Apex was not a party to the contract, it must in state in other counts the specific facts supporting its averment that Apex is liable to it.

discharge oil "into or upon the navigable waters or adjoining shorelines."  33 U.S.C. § 2702(a).

PF&T argues that the OPA does not apply where, as here, a plaintiff alleges that oil was

discharged into the groundwater—as opposed to being discharged directly into a "navigable

water"—even if the groundwater is hydrologically connected to a body of "navigable water."

The first question is what facts Chevron has alleged regarding the location of the

petroleum discharge from the Pipeline.  Chevron contends that it made the general allegation that

PF&T discharged oil directly into the Harbor.[3]  But I cannot agree with this description of the

allegations.  In its complaint, Chevron describes in detail the underground pathway by which the

petroleum allegedly traveled from the Pipeline to the Harbor.  The complaint very clearly alleges

that the oil leaked into "the groundwater beneath [the Site]," (ECF No. 1 ¶ 2); where over the

course of several years it "migrate[d] across the Site" toward "new locations down-gradient from

the Pipeline," (*id.* ¶¶ 11, 13); eventually entered a "stormwater system . . . approximately 200

yards from the Pipeline," (*id.* ¶ 45); then "seep[ed] . . . into [a drainage channel] on the southern

end of the Site," (*id.* ¶ 48); and eventually, through an "outfall pipe" connected to the drainage

channel, "emptie[d] into the Harbor."  (*Id.* ¶¶ 51, 4).  Having thus alleged with precision the

attenuated underground path by which the contamination reached the Harbor from the

groundwater surrounding the Pipeline, Chevron cannot now take refuge in broader language in

the complaint merely alleging that oil was discharged into the Harbor.[4]

The question thus remains whether such a claim—that is, one alleging the release of oil

into groundwater—is cognizable under the OPA.  I conclude that it is not.  The OPA defines

---

[3]  The parties do not dispute that the Harbor constitutes a "navigable water" under the statute.
[4]  Notably, save for the underground pathway Chevron describes so thoroughly, Chevron alleges
no other way by which the petroleum could have entered the Harbor.

"navigable waters" simply as "waters of the United States." 33 U.S.C.A. § 2701(21).[5]  There is

some dispute among district courts as to whether groundwater constitutes "navigable water"

under the OPA/CWA.  Many courts have held that groundwater is not "navigable water."  *See,*

*e.g.*, *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798, 810

(E.D.N.C. 2014) (holding that "Congress did not intend for the CWA to extend federal

regulatory authority over groundwater, regardless of whether that groundwater is eventually . . .

'hydrologically connected' to navigable surface waters"); *Tri-Realty Co. v. Ursinus Coll.*, No.

11-5885, 2013 WL 6164092, at *9 (E.D. Pa. Nov. 21, 2013) (same); *Umatilla Waterquality Prot.*

*Ass'n v. Smith Frozen Foods, Inc.*, 962 F. Supp. 1312, 1320 (D. Ore. 1997) (same); *Cooper*

*Indus., Inc. v. Abbott Labs.,* No. 93-0193, 1995 WL 17079612, at *4 (W.D. Mich. May 5, 1995)

(same).  But other courts have found that it is.  *See, e.g.*, *Hawai'i Wildlife Fund v. Cty. Of Maui*,

24 F. Supp.3d 980, 996 (D. Haw. 2014) (holding that "[i]t is the migration of the pollutant into

navigable-in-fact water that brings groundwater under the [CWA]."); *Ass'n Concerned Over Res.*

*& Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, No. 10-0084, 2011 WL 1357690, at *17

(M.D. Tenn. Apr. 11, 2011) (same); *Idaho Rural Council v. Bosma*, 143 F. Supp.2d 1169, 1180

(D. Idaho 2001) (same); *Mut. Life Ins. Co. v. Mobil Corp.,* No. 96-1781, 1998 WL 160820, at *3

(N.D.N.Y. 1998) (same).

 The only two circuits to address the issue have held that oil discharges into

groundwater—even if potentially connected to navigable waters—does not give rise to a claim

under the OPA.  *See Rice v. Harken Exploration Co.*, 250 F.3d 264, 270 (5th Cir. 2001) (holding

---

[5]  This definition is the same as the definition of "navigable waters" in the Clean Water Act
("CWA").  *See* 33 U.S.C. § 1362(7).  Citing this identical definition and the legislative history of
the OPA, courts routinely apply cases interpreting the CWA to interpret the OPA.  *See, e.g.*, *Rice*
*v. Harken Exploration Co.*, 250 F.3d 264, 268 (5th Cir. 2001).  Finding this reasoning
persuasive, I look to existing CWA and OPA case law to determine whether Chevron's
allegations of oil discharge into groundwater is cognizable under the OPA.

that "ground waters are not protected waters under the CWA," and that "subsurface waters are not 'waters of the United States' under the OPA"); *Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 963, 965 (7th Cir. 1994) (holding that contaminated groundwater, "just because [it] may be hydrologically connected with surface waters," and even though it may eventually reach streams, lakes, and oceans, is not regulated under the CWA).  This narrower interpretation of "navigable water" is more persuasive.

First, such a reading finds more support in statutory language of the CWA.  As several courts have observed, in other provisions of the CWA, Congress refers to "navigable waters" and "ground waters" as separate concepts, thus indicating that Congress considered them to be distinct.  *See, e.g.*, 33 U.S.C. § 1252(a); *id*. § 1254(a)(5); *id*. § 1256(e)(1) (referring to "navigable waters *and* ground waters") (emphasis added).   Second, the legislative history of the CWA indicates that Congress chose not to regulate groundwater, in part because "the jurisdiction regarding groundwaters is so complex and varied from State to State."  S. Rep. No. 92-414 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3739.

Finally, this narrower interpretation of "navigable waters" is supported by the Supreme Court's ruling in *Rapanos v. United States*, 547 U.S. 715 (2006).  There, the Court considered what standard to apply in order to determine if certain *wetlands* constitute "navigable waters" under the CWA.   In setting forth tests that excluded some wetlands from the scope of the CWA, the Supreme Court eschewed a broad interpretation of "navigable waters" and repeatedly cautioned against "attempting to expand the definition of navigable waters to encompass virtually all water, regardless of its actual navigability, location, or consistency of flow."  *Cape Fear*, 25 F. Supp.3d at 809; *see Rapanos*, 547 U.S. at 733-34.

For these reasons I hold that Congress did not intend for groundwater to fall within the purview of "navigable water," even if it is hydrologically connected to a body of "navigable water." Therefore, because the groundwater contamination alleged by Chevron is not cognizable under OPA, Counts III and IV are dismissed.

### B.  Pipeline Safety Act Claim

Count V in Chevron's complaint alleges a violation of the PSA. The PSA imposes various safety obligations on gas pipeline owners and operators and empowers the Secretary of Transportation to issue regulations prescribing minimum safety standards. 49 U.S.C. § 60102. The PSA also authorizes injunctive citizen suits against parties that violate the statute or its attendant regulations and orders. *Id.* § 60121(a)(1). Chevron alleges that PF&T violated the PSA and its related regulations in a variety of ways, including by failing to comply with applicable safety standards for maintaining the Pipeline, as well as by failing to follow a manual for controlling discharges of petroleum. (ECF No. 1 ¶ 120).

PF&T argues that Chevron lacks standing to bring a PSA claim because none of the relief it seeks would be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (to have standing, a plaintiff must demonstrate that "it is likely . . . that the injury will be redressed by a favorable decision.") (internal quotations and citation omitted). This argument lacks merit. Even though Chevron alleged that the Pipeline is now "out of service" (ECF No. 1 ¶ 73), Chevron did *not* allege that PF&T no longer owns the Pipeline, or that the discharge of petroleum from the Pipeline has ceased. To the contrary, Chevron's allegation that "since [the Pipeline was taken out of service], product seeps have declined" (ECF No. 1 ¶ 74) indicates that the Pipeline continues to discharge contaminants. Construing the facts and inferences in the light most favorable to the plaintiff, it is entirely plausible that because

PF&T still owns the Pipeline (whether or not it is still in service), and the Pipeline still discharges oil, PF&T continues to violate the PSA by failing to comply with safety standards for maintaining the Pipeline and controlling the discharge of petroleum.  Particularly in light of the parties' dispute as to whether PF&T has actually abandoned the Pipeline, I cannot now resolve whether the relief Chevron seeks would be redressed by a favorable decision.  Accordingly, I withhold judgment on the viability of this claim until the parties have conducted adequate discovery.  The motion to dismiss Count V is denied.

### C.  Maryland Environmental Article Claim

Chevron's final statutory claim alleges a violation of Maryland's Environmental Article (Count IX).  Subtitle 4 of the Environmental Article of the Maryland Code gives the Maryland Department of the Environment the authority to regulate the transportation of oil, as well as additional powers to contain and remediate spills.  *See* Md. Code Ann., Envir. § 4-401 *et seq*.

Ostensibly, Chevron brings this claim under § 4-419 of the Article. (*See* ECF No. 1 ¶ ¶ 113, 155).  Section 4-419, however, does not create a private right of action, but instead provides immunity to persons who provide assistance in the course of contamination remediation.  The plain text of that provision states that "a person is not liable for costs of containment, cleanup, and removal of the discharge or damages as a result of acts or omissions taken in the course of rendering care, assistance, or advice" in response to oil contamination, unless that person falls under one of three exceptions.  Md. Code Ann., Envir. § 4-419(a); *see also Scope of Immunity for Responders to Potential or Actual Oil Spills*, Office of the Attorney General, 77 Md. Op. Att'y Gen. 69, at 1 (1992) (describing § 4-419 as establishing "immunity from liability . . . [for] a responder who renders care, assistance, or advice in an unsuccessful attempt to prevent a discharge of oil").

Even if Chevron properly brought a cause of action under § 4-409—which *does* create a private right of action—the Maryland Court of Appeals has held that § 4-409 is limited to spillage from a vessel, ship or boat.  *See JBG/Twinbrook Metro Ltd. Partnership v. Wheeler*, 346 Md. 601, 697 A.2d 898, 904 (Md. 1997) (examining the statutory history of the provision; holding that private actions under § 4-409 are limited only to damages arising from "spillage from a vessel, ship, or boat.").  Accordingly, Chevron cannot bring a claim under the Maryland Environmental Article, and Count IX is dismissed.

## III.    Contract Claims (Counts I, II, X, XI)

Chevron brings four contract and quasi-contract claims against PF&T: breach of contract (Count I); indemnification (Count II); quantum meruit based on implied-in-law contract and unjust enrichment (Count X); and quantum meruit based on implied-in-fact contract (Count XI).

### A.  Breach of Contract

In Count I, Chevron alleges that PF&T breached the Agreement by: (1) "fail[ing] to notify Chevron of New Contamination;" (2) "fail[ing] to act promptly to minimize the effects of New Contamination;" and (3) "fail[ing] to provide records in response to Chevron's July 2014, request for documents to determine defendants' compliance with federal, state, and local laws and regulations related to its operations."  (ECF No. 1 ¶¶ 82-86).  PF&T asserts that claims involving the first two alleged breaches are barred by the statute of limitations, and that the claim involving the third alleged breach should be dismissed because Chevron cannot demonstrate any injury resulting from it.  (ECF No. 16, pp. 31-38).

### i.  Breaches One and Two: Failure to Notify and Failure to Act Promptly

Regarding the first two alleged breaches, Maryland law requires that a civil action be filed "within three years from the date it accrues."  Md. Code Cts. & Jud. Proc. § 5-101.

Although the statute of limitations for a breach of contract claim usually begins to accrue on the date of the alleged breach, that date may be extended by Maryland's "discovery rule." *See Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 31 A.3d 212, 236 (Md. 2011). Under the discovery rule, limitations begin to run when a claimant knows, or should have known, of the existence of an injury. *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 749 A.2d 796, 801 (Md. 2000). In other words, a claimant is under "inquiry notice"—and thus the statute of limitations will accrue—when the claimant "has knowledge of circumstances which would cause a reasonable person in [its position] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [cause of action]," regardless of whether such an investigation was actually undertaken. *Id.* at 446 (quoting *O'Hara v. Kovens*, 305 Md. 280, 503 A.2d 1313, 1317-18 (Md. 1986)).

Here, Chevron's own allegations demonstrate that Chevron was on inquiry notice of petroleum discharges from the Pipeline well before it brought this action. First in 1997, when Chevron "detected the presence of liquid petroleum hydrocarbons in monitoring and gauging locations that [prior to the sale of the Pipeline to PF&T] had been free of liquid petroleum." (ECF No. 1 ¶ 44). Again in 1999, when Chevron "detected liquid petroleum in the stormwater system parallel to and approximately 200 yards from the Pipeline." (*Id.* ¶ 45). Third in 2009, when Chevron "began observing petroleum from the groundwater exfiltrating, or seeping, into the Channel." (*Id.* ¶ 48). And fourth in 2011, when Chevron discovered "some 30 to 40 gallons

of petroleum discharged to the Harbor through the drainage Channel." (*Id.* ¶ 51).[6]  It is clear

from these alleged facts that Chevron had "knowledge of circumstances which would cause a

reasonable person in [Chevron's position] to undertake an investigation which, if pursued with

reasonable diligence, would have led to knowledge of the alleged [breaches of contract]."

*Lumsden*, 749 A.2d at 802 (quoting *O'Hara*, 503 A.2d at 1324).

Chevron argues, however, that its contract claims are not barred by the three-year statute

of limitations because the continuing harm doctrine—which "tolls the statute of limitations in

cases where there are continuing violations"—applies here.  *Litz v. Maryland Dep't of Env't*, 434

Md. 623, 76 A.3d 1076, 1089 (Md. 2013) (internal citation and quotation omitted); *see also Dave*

*& Buster's, Inc. v. White Flint Mall, LLP*, No. 14-1794, 2015 WL 3622239, at *4 (4th Cir. June

11, 2015) (applying continuing harm doctrine to breach of contract action).  "The continuing

harm doctrine tolls the statute of limitations regardless of a potential plaintiff's discovery of the

wrong." *Id.* at 647 n. 9.  Under this doctrine, "every repetition of the wrong creates further

liability and creates a new cause of action, and a new statute of limitations begins to run after

each wrong perpetuated." *Jones v. Speed*, 320 Md. 249, 577 A.2d 64, 69 n. 4 (Md. 1990).

Accordingly, "violations that are continuing in nature are not barred by the statute of limitations

---

[6] In its opposition brief, Chevron argues that the complaint does not allege that Chevron knew PF&T caused the New Contamination or that PF&T breached the contract.  (ECF No. 21, p. 11). But the relevant question under Maryland law is whether Chevron's allegations show that it had "knowledge of circumstances" which would cause a reasonable person in its position to investigate, and thereby discover that it has a cause of action.  *Lumsden*, 358 Md. at 446.  It can certainly be said that a reasonable person in Chevron's position, upon discovering petroleum "of a type markedly changed from the [Covered Contamination]" that appeared "in locations that [before the sale of the Pipeline to PF&T] had been free of liquid petroleum" (ECF No. 1 ¶¶ 11, 44), would have begun an investigation.  Moreover, Chevron apparently *did* investigate, and did discover that "newly present petroleum was fresh gasoline, not weathered diesel for which Chevron was responsible," thus leading to the conclusion that PF&T had caused the contamination and had failed to notify Chevron of it (*id.* ¶ 44).

merely because one or more of them occurred earlier in time." *Litz*, 434 Md. at 646 (internal

quotations and citation omitted).

The continuing harm doctrine applies here.  As discussed *supra*, Chevron clearly alleges

ongoing contamination from the Pipeline and claims that PF&T continues to violate its

obligations in responding to the contamination.  (*See, e.g.*, ECF No. 1 ¶ ¶ 2, 40, 55, 77).

Therefore, because the discharge and PF&T's alleged breaches were ongoing when Chevron

filed the complaint, its contract claims are not barred by the statute of limitations.  *See SPS Ltd.*

*P'ship, LLLP v. Sparrows Point, LLC*, No. 14-589, 2015 WL 4724883, at *5 (D. Md. Aug. 7,

2015) (holding that, where the plaintiff alleged "a continuous discharge of hazardous chemicals"

and "a continuous violation of [the defendant's] duty to control and stop it," the continuing harm

doctrine applied and thus the claims were "within the statute of limitations.").

However, under this doctrine, a claimant's damages "are limited to those occurring

within the 'three year period prior to the filing of the action.' " *Litz*, 76 A.3d at 1089 (quoting

*Shell Oil Co. v. Parker,* 265 Md. 631, 291 A.2d 64, 67 (Md. 1972)).  In other words, although

Chevron's breach of contract claims may not be barred by the statute of limitations, the damages

it can recover are so limited.  *Id.*; *see also SPS*, 2015 WL 4724883, at *5 ("[a]lthough [the

plaintiff's] *claims* are viable, the damages it can recover are limited by the statute of

limitations").  Accordingly, Chevron cannot recover damages for breaches that occurred before

February 6, 2012—three years prior to filing its complaint.

### ii.  Breach Three: Failure to Provide Records Upon Request

Finally, as to the third alleged breach of the Agreement—PF&T's alleged failure to

provide records regarding its compliance with regulations in 2014—PF&T contends that

Chevron has failed to allege injury resulting from the breach.   "[I]n order to maintain action for

breach of contract, [a] plaintiff must show that alleged breach caused injury." *In re Peanut Crop Ins. Litig.*, 524 F.3d 458, 473 (4th Cir. 2008) (citation omitted).  PF&T asserts that all the damages Chevron alleges to have been caused by PF&T's breaches occurred prior to 2014, but this is simply not the case.  It is manifest throughout Chevron's complaint that it alleges ongoing damages, and does not differentiate between types of damages for each breach.  (*See, e.g.*, ECF No. 1 ¶ 87) ("As a result of defendants' breaches, Chevron has incurred and continues to incur damages and removal costs . . .").  Reading the facts in the light most favorable to Chevron, it is entirely plausible that PF&T's alleged failure to procure records has "hindered Chevron's remediation efforts at the Site," contributed to "increased . . . costs and length of time remediating the Site," and "exacerbated the impact of the contamination."  (*Id.* ¶ 77). Accordingly, Chevron has alleged adequate damages as to its breach of contract claim regarding the third alleged breach.

*      *      *

In sum, Chevron's breach of contract claims may proceed, but Chevron cannot recover damages resulting from breaches that occurred prior to February 6, 2012.  Of course, it is Chevron's burden ultimately to substantiate these damages.

### B.  Indemnity Claim

In Count Two, Chevron brings a claim for indemnification, asserting entitlement to "all claims, expenses (including reasonable attorneys' fees), losses and liabilities arising from the Covered Contamination and the New Contamination."  (ECF No. 1 ¶ 89-95).  Maryland's three-year statute of limitations also applies to indemnity claims, which begin to accrue "at the time payment was made by the party seeking indemnification."  *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp.2d 739, 757 (D. Md. 2001).  But because Chevron failed to allege a

condition precedent to indemnification under the Agreement, its recovery for indemnification must be limited accordingly.

A condition precedent in a contract is "a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises." *Chirichella v. Erwin,* 270 Md. 178, 310 A.2d 555, 557 (Md. 1973) (internal quotations and citation omitted).  It is axiomatic that "a plaintiff must plead affirmatively satisfaction of a condition precedent."  *Hansen v. City of Laurel*, 420 Md. 670, 684, 25 A.3d 122, 131 (Md. 2011); *see also Cannon v. McKen*, 296 Md. 27, 38, 459 A.2d 196, 202 (Md. 1983) ("It is a basic rule of law that where a cause of action is dependent upon a condition precedent, plaintiff must allege performance of such condition or show legal justification for nonperformance.").

Here, Section 13 of the Agreement—a provision generally governing the parties' indemnification rights and responsibilities under the contract—clearly creates a condition precedent to bringing an indemnity claim.  Section 13(c)(1) provides that "[i]n the case of *any claim for indemnification* brought under this Agreement," the party seeking indemnification "*shall notify* the party obligated to provide indemnification . . . with reasonable promptness of its discovery of any matter giving rise to such claim."  (ECF No. 1, Ex. B, p. 22) (emphasis added). As discussed *supra*, Chevron alleges in its complaint that it discovered New Contamination as early as 1997, and then again in 1999, 2009, 2011, and 2012.  But Chevron concedes that it did not provide PF&T any notice about this alleged contamination until July 8, 2014, when it sent a letter to Apex about the New Contamination.  (*Id*., Ex. C, p. 7 of 9).

PF&T seems to suggest that because the July 2014 letter made no reference to a right to indemnification, it cannot be considered to satisfy the Agreement's mandatory notice requirement.  However, nothing in the contract requires the party seeking indemnification to

specify that it will seek indemnification; rather, the contractual language simply states that it

must notify PF&T "of its discovery of any matter giving rise to such claim." (*Id.*, Ex. B, p. 22).

Thus, Chevron's failure in that letter to mention indemnification as a possible cause of action

does not preclude indemnity for costs arising after the notice.  Accordingly, Chevron states a

valid claim for indemnification for costs incurred after July 8, 2014.

### C.  Quasi-Contractual Claims

Although Maryland's three-year statute of limitations also applies to Chevron's quasi-

contractual claims (Counts X and XI), these claims must be dismissed in their entirety for an

altogether separate reason.

Quantum meruit "provide[s] relief for a plaintiff when an enforceable contract does not

exist but fairness dictates that the plaintiff receive compensation." *Cnty. Comm'rs of Caroline*

*Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96-97, 747 A.2d 600, 607 (Md. 2000)

(internal quotations and citation omitted).  As a general rule, "no quasi-contractual claim can

arise when a contract exists between the parties concerning the same subject matter on which the

quasi-contractual claim rests."  *Id.* (internal quotations and citation omitted); *see also FLF, Inc.*

*v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland,

and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of

the claim is covered by an express contract between the parties.").  Thus, although a plaintiff

"may not recover under both contract and quasi-contract theories, [he/she] is not barred from

pleading these theories in the alternative where the existence of a contract concerning the subject

matter is in dispute."  *Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F.

Supp.2d 785, 792 (D. Md. 2002)

Here, there is no dispute as to whether Chevron and PF&T were parties to a valid,

enforceable contract.  Furthermore, Chevron has made no allegations of bad faith or fraud in the

contract's formation.  *See Jones v. Pohanka Auto N., Inc.*, 43 F. Supp.3d 554, 573 (D. Md. 2014)

(noting that although a plaintiff may plead in the alternative by asserting claims for unjust

enrichment and breach of contract, when doing so the "plaintiff's claim for unjust enrichment

*must* include an allegation of fraud or bad faith in the formation of the contract.") (citing cases).

Thus, for these reasons, Counts X and XI are dismissed.

## IV.     Tort Claims (Counts VI, VII, VIII)

Chevron asserts three tort claims against PF&T: negligence *per se* (Count VI), negligence

(Count VII), and contribution under the Maryland Uniform Contribution Among Joint

Tortfeasors' Act (Count VIII).  Although Maryland's three-year statute of limitations also

applies to Chevron's tort claims, *see* Md. Code Cts. & Jud. Proc. § 5-101, each must be

dismissed in its entirety for independent reasons.

### A.  Negligence Claim

Count VII alleges a negligence claim against PF&T.[7]  PF&T contends first that Maryland

law does not recognize a cause of action for negligence arising from a contractual relationship

between two parties, and second that Chevron has not alleged sufficient facts to establish the first

element of a negligence claim—a duty of care owed by PF&T to Chevron.  PF&T's argument

prevails.

---

[7] Chevron also brings a claim of negligence *per se* against Chevron (Count VI).  But as PF&T
correctly points out—and Chevron does not contest—Maryland does not recognize negligence
*per se* as a cause of action. *See Great Am. Assur. Co. as Subrogee of Prince Bozzuto Ltd. P'ship
v. Ferguson*, No. 10-0915, 2010 WL 5173714, at *5 (D. Md. Dec. 14, 2010).  Therefore, Count
VI is dismissed.

A duty is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Blondell v. Littlepage*, 413 Md. 96, 120, 991 A.2d 80, 94 (Md. 2010) (internal quotations and citation omitted).  Under Maryland law, "[a] contractual obligation, by itself, does not create a tort duty." *Mesmer v. Maryland Auto. Ins. Fund*, 353 Md. 241, 253, 725 A.2d 1053, 1058 (Md. 1999); *see also Heckrotte v. Riddle*, 168 A.2d 879, 882 (Md. 1961) ("The mere negligent breach of a contract . . . is not enough to sustain an action sounding in tort .").  This is so "even when the failure to perform the contract results from the defendant's negligence." *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639, 654, 741 A.2d 1099, 1107 (Md. 1999).  Accordingly, when the relationship between two parties is contractual, any tort duty owed by the defendant to the plaintiff "must be independent of the contractual obligation." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 328, 424 A.2d 744, 754 (Md. 1981).

Maryland courts have recognized an "independent duty" in several contexts—including those involving professional occupations, vulnerable parties, and principal-agent relationships. *See Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 541, 515 A.2d 756, 763 (1986) ("The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants."); *id*. at 763 (holding that bank had a duty toward customer, where customer was "particularly vulnerable and dependent upon the Bank's exercise of due care"); *Bogley v. Middleton Tavern*, 288 Md. 645, 650, 421 A.2d 571, 573 (Md. 1980) (noting that it is well settled in Maryland that, "like conventional agents, an insurance agent must exercise reasonable care and skill in performing his duties.").

But the parties' relationship in the instant case "in no way resembles [these] unique contexts." *Natural Prod. Solutions, LLC v. Vitaquest Int'l, LLC*, No. 13-436, 2014 WL 6383482,

at *9 (D. Md. Nov. 13, 2014).  Chevron has not alleged facts showing that it was a vulnerable party in this transaction, or showing any independent duty owed by PF&T as a function of its business relationship with Chevron.  To the contrary, Chevron's relationship with PF&T is a straightforward buyer-seller relationship between "sophisticated parties in positions of equal bargaining strength."  *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.*, 763 F. Supp. 1327, 1332 (D. Md. 1991), *aff'd in part, rev'd in part,* 991 F.2d 98 (4th Cir. 1992).  Thus, "[r]ecognizing a tort duty here would be erasing the fundamental distinction between claims in tort and claims in contract."  *Vitaquest*, 2014 WL 6383482, at *9 (internal quotations and citation omitted).[8]  Chevron's negligence claim against PF&T is dismissed.

### B.  Maryland Uniform Contribution Among Joint Tortfeasors Act Claim

Count VIII asserts a right to contribution under the Maryland Uniform Contribution Among Joint Tortfeasors Act ("UCATA"), which establishes a right to contribution among joint tortfeasors.  *See* Md. Code Ann., Cts. & Jud. Proc. § 3-1401 *et seq*.  The UCATA "is only applicable to a situation where there is a common liability to an injured person in tort"—that is, where the injured person has a "right of action against the third-party defendant."  *Baltimore Transit Co. V. State, to Use of Schriefer*, 183 Md. 674, 679-80, 39 A.2d 858, 860 (Md. 1944).

---

[8] Chevron's additional argument that the statutes under which it brings claims establish a duty of care is meritless.  In order for the breach of a statutory duty to establish evidence of negligence, the plaintiff must be "a member of the class of persons the statute was designed to protect."  *Erie Ins. Co. v. Chops*, 322 Md. 79, 84, 585 A.2d 232, 234 (Md. 1991).  The statute must "set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole."  *Remsburg v. Montgomery*, 376 Md. 568, 584, 831 A.2d 18, 27 (Md. 2003) (quotation and citation omitted).  None of the statutes on which Chevron relies, however, purport to protect a particular class of persons, but rather the public and the environment as a whole.  *See* 49 U.S.C. § 60102(a)(1) ("The purpose of [the PSA] is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities . . ."); Md. Code Ann., Envir. § 4-403 ("It is the purpose of this subtitle to provide additional and cumulative remedies to prevent, abate, and control the pollution of the waters of the State"); 15 C.F.R. § 990.10 ("The goal of the [OPA] . . . is to make the environment and public whole for injuries to natural resources and services resulting from an incident involving a[n] [oil] discharge").

Here, Chevron has failed to allege the necessary prerequisites for a claim under the

UCATA.  First, although Chevron makes the general allegation that it is "liable" for

contamination under MDE's Oil Control Program (ECF No. 1 ¶ 8), nowhere does Chevron

allege that this responsibility to conduct remediation does not constitute liability *in tort* to the

MDE (or any other injured party).  Second, although Chevron generally alleges that "defendants

are responsible" for the contamination (*see, e.g.*, *id.* ¶ ¶ 148-49), Chevron fails to allege that

either the MDE or any other injured party has a right of action in tort against PF&T.  Thus,

Chevron has failed to allege that it and PF&T are "liable in tort to the same person for the same

harm," and Count VIII is dismissed.  *Wassel v. Eglowsky*, 399 F. Supp. 1330, 1367 (D. Md.

1975).

## V.      Declaratory Relief (Count XII)

Count XII consists of various requests for declaratory relief.  These requests, however,

are adequately and directly addressed in the first eleven counts of the complaint.  "When

declaratory relief would be duplicative of claims already alleged, dismissal is warranted."

*Sharma v. OneWest Bank, FSB*, No. 11-0834, 2011 WL 5167762, at *6 (D. Md. Oct. 28, 2011);

*see also Harte–Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp.2d

505, 528 (D. Md. 2004).  To the extent that Chevron "seeks relief that is separate and distinct"

under the Declaratory Judgment Act (ECF No. 21, p. 50), these claims must also be dismissed

because Chevron fails to state any independent basis for such relief.  *MetroPCS Wireless, Inc. v.

Cmty. Voice Line, LLC*, No. 11-501, 2012 WL 1901484, at *4 (D. Md. May 24, 2012) ("absent

an independent legal right, the Declaratory Judgment Act does not confer jurisdiction") (internal

quotations and citation omitted).  The court grants the motion to dismiss as to Count XII.

## **CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part.  Chevron's claims against Apex are dismissed, and Counts III–IV and VI–XII are dismissed as to PF&T.  A separate order follows.


_____10/20/2015_____                    _____/s/_____
Date                                              J. Frederick Motz
                                                  United States District Judge